KILPATRICK TOWNSEND & STOCKTON LLP
KENDRA C. CHAPMAN (Bar No. 294030)
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111
Tel.: (415) 576-0200
Fax: (415) 576-0300

KILPATRICK TOWNSEND & STOCKTON LLP
ROB ROY SMITH (WA Bar No. 33798)
(*Pro Hac Vice Application to be filed*)
RACHEL SAIMONS (WA Bar No. 46553)
(*Pro Hac Vice Application to be filed*)
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
Tel.: (206) 467-9600; Fax: (206) 623-6793

Attorneys for Plaintiff
BUENA VISTA RANCHERIA OF ME-WUK INDIANS

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| BUENA VISTA RANCHERIA OF ME-WUK INDIANS, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>RHONDA MORNINGSTAR POPE FLORES, PATI GONSALVES, RON PINA, LITTLE BIG TIME CHILD DEVELOPMENT CENTER, AND GRAND PRICE ODEUM LLC,<br><br>Defendants. | Case No.: ______________<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Comes now the Buena Vista Rancheria of Me-Wuk Indians ("Tribe" or "Plaintiff"), and alleges as follows:

**JURISDICTION AND VENUE**

1. This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under the Federal Racketeer Influenced and Corrupt Organizations Act ("Federal RICO"), and pursuant to 28 U.S.C. § 1362 because the Tribe is a federally-recognized Indian tribe.

2. The Court has personal jurisdiction over each of the Defendants because each of the Defendants either resides or was formed in the State of California and the facts, actions, and occurrences giving rise to this litigation take place within the Eastern District of California. This Court further has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b) & (d).

3. This Court has jurisdiction over Plaintiff's related state and common law claims pursuant to the doctrine of supplemental jurisdiction. 28 U.S.C. § 1367.

4. Venue is proper in this District because the Defendants are situated in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District. 28 U.S.C. § 1391(e).

**NATURE OF THE ACTION**

5. The Tribe brings this action to remedy an ongoing scheme to misappropriate Tribal government funds and real property for the benefit of Defendants and not the Tribe. At the center of the scheme is defendant Rhonda Morningstar Pope Flores, who served as Chairwoman of the Tribe's Tribal Council for two decades, from 2004 until March 2024. Beginning in or about 2020, and continuing to the present, Defendant Flores organized and led a RICO enterprise with activities constituting mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and attempted extortion (18 U.S.C. § 1951). Two separate entities formed

by Defendant Flores—Grand Prince Odeum LLC ("GP Odeum") and Little Big Time Child Development Center ("LBT")—have played important roles in the scheme. Also participating have been Defendants Gonsalves and Pina, who have assisted the RICO enterprise by conspiring with Flores to threaten current Tribal leadership in an attempt to return to the time when the Tribe's governmental funds were treated by Defendant Flores as her personal piggy bank.

6. By means of this action, the Tribe seeks for all Defendants be found jointly and severally liable to the extent of: (a) treble the damages incurred by the Tribe due to Defendants' unlawful activity; (b) attorneys' fees spent bringing this lawsuit; and (c) an amount otherwise to be decided by a jury for Defendants' illegal and fraudulent actions.

7. By bringing this lawsuit, the Tribe does not seek to vindicate its sovereign rights, but rather seeks to assert a right that Federal RICO makes available to every person who has been injured by racketeering activity, i.e., the right to recover damages to business or property.

**PARTIES**

8. Plaintiff, Buena Vista Rancheria of Me-Wuk Indians, is a federally-recognized sovereign Indian tribe operating under the Tribe's Constitution, and is governed by a Tribal Council. The Tribe is included on the Department of the Interior's list of recognized Indian tribes and has been included on every version of this list since approximately 1985. The Tribe expressly reserves its inherent sovereign immunity for all purposes.

9. Defendant Rhonda Morningstar Pope Flores resides in Elk Grove, California and is a member of the Board of Directors of LBT. Defendant Flores is the former Chairwoman of the Tribe's Tribal Council, a position she held from 2004 until she resigned on March 19, 2024.

10. Defendant Pati Gonsalves resides in Rancho Murieta, California, and is a member of the Board of Directors of LBT. Gonsalves is a decades-long personal friend of Defendant Flores.

11. Defendant Ron Pina resides in Davis, California, and is a member of the Board of Directors of LBT. Defendant Pina was Defendant Flores's high school teacher. Defendant Flores made Defendant Pina an advisor to the Tribe in or around 2010.

12. Defendant GP Odeum is a limited liability company formed under the laws of the State of California. On information and belief, GP Odeum owns and operates a building and event space in Winters, California called "Grand Prince Odeum," a name chosen by Defendant Flores.

13. Defendant LBT is incorporated in California as a Public Benefit Corporation and operates as an Internal Revenue Service 501(c)(3) non-profit in Sacramento, California. Beginning in 2008, LBT was responsible for operating a preschool in downtown Sacramento.

## FACTS

### A. BRIEF HISTORY OF THE BUENA VISTA RANCHERIA OF ME-WUK INDIANS

14. The Tribe has occupied the Amador County region and the lands upon which the Tribe's 67.5-acre Rancheria property currently sits since time immemorial. Despite generations of abuse, neglect, the Mission period, the Gold Rush, and destructive federal policies toward Indian tribes, including the termination era of the 1950s—all of which stripped away land ownership—the Tribe survived. In the early twentieth century, the United States created a network of small land parcels called "Rancherias" for landless Indian tribes in California. The United States purchased the lands constituting the Buena Vista Rancheria in 1927 with money appropriated by the Acts of June 21, 1906 (34 Stat. 325-328), and April 30, 1908 (35 Stat. 70-76). The United States' purchase was intended to

establish the Rancheria as a reservation for the Tribe to be held in trust for the benefit of the Tribe and its members in perpetuity. *See Cty. of Amador, Cal. v. U.S. Dep't of the Interior*, 136 F.Supp.3d 1193, 1201 (E.D. Cal. 2015), *aff'd sub nom. Cnty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012 (9th Cir. 2017) (citing AR900; ECF No. 65 at 16).

15. As an outgrowth of the 1950s federal "termination" era, during which the government disestablished the legal status of many Indian tribes across the country, Congress enacted the 1958 "California Rancheria Act," Pub. L. 85-671 at 72 Stat. 619, amended in 1964 by 78 Stat. 390 ("Termination Act"). The Termination Act disestablished many California Indian Rancherias, including the Buena Vista Rancheria, and terminated the legal status of the related Indian tribes and their members as Indians under federal law. The United States distributed Buena Vista Rancheria lands (a single 67.5-acre parcel) to the Tribe's members, then withdrew the trust status of the Buena Vista Rancheria and dissolved the Rancheria boundaries. The Termination Act required the United States to improve or construct roads serving the terminated Rancheria lands, to upgrade the related irrigation, sanitation, and domestic water systems, and to provide certain educational and other benefits and services to the terminated Tribe and its members. The federal government failed to fulfill its commitments to the terminated California tribes, and litigation ensued against the United States and various California counties to restore the affected tribes to their pre-termination status. *Tillie Hardwick v. United States, et al.*, Case No.: 5:79-CV-01710 (N.D. Cal.).

16. The Plaintiff Indians and restored tribes and Rancherias, on the one hand, and the Federal and county defendants (including, with respect to the Tribe, Amador County), on the other hand, settled the case by stipulated judgment. The settlement generally took the form, first, of a stipulation to restore the terminated

tribes and Indians and, second and later, a stipulated judgment to restore the boundaries of the terminated reservations.

17. In the case of the Tribe, a 1983 stipulated judgment restored the individual Indian plaintiffs to their status as Indians under federal law, restored the recognized status of the Tribe, and required the United States to add the restored Tribe to the Bureau of Indian Affairs' ("BIA") Federal Register list of recognized Indian tribes.

18. A 1987 second stipulated judgment provided that the Rancheria was "never and [is] not now lawfully terminated," restored the Rancheria's original boundaries, and further declared that all land within the restored Rancheria boundaries is "Indian country"—the legal term of art for lands subject to tribal jurisdiction, as defined by 18 U.S.C. § 1151.

19. The 1987 stipulated judgment further required the United States and Amador County to treat the Rancheria "as any other federally recognized Indian Reservation," and provided that "all of the laws of the United States that pertain to federally recognized Indian Tribes and Indians" shall apply to the Rancheria.

20. The Tribe's struggles were far from over, however. The 1983 stipulation contained, among other things, language that required the United States to accept the restored Buena Vista Rancheria lands back into trust so that the restored Tribe and Tribal members could enjoy the full benefits of their restoration. This "mandatory trust" language was intended to spare the Tribe from navigating the BIA's highly uncertain and often protracted discretionary fee-to-trust process set out in 25 CFR § 151. In 1996, the Tribe asked BIA to return to trust status the single parcel of land making up the restored Rancheria. The BIA denied the request and erroneously advised Buena Vista that the request was required to undergo the part 151 process—as if the *Tillie Hardwick* litigation and the 1983 stipulation had no impact on the matter.

21. In 2010, the Tribe again asked the BIA to acquire title to the restored Rancheria in trust under the express mandatory trust provisions of the 1983 stipulation. Rather than grant or deny the request, the BIA and various offices within the Department of Interior endlessly bounced the Tribe's request back and forth for ten years of interminable bureaucratic confusion and delay.

22. In 2018, BIA denied the Tribe's mandatory trust request in a decision that it purported (inaccurately) could not be appealed and invited the Tribe to file an entirely new application, presumably under the discretionary part 151 regulations. Finally, the Tribe moved the *Tillie Hardwick* court in July 2020 for enforcement of the 1983 stipulation. The court granted the Tribe's motion in November 2020, and the BIA placed the Rancheria lands back into trust in March 2021.

**B. GRAND PRINCE ODEUM LLC**

23. Defendant Flores owns a private building and event space located at 210 Main Street in Winters, California. On information and belief, Defendant Flores purchased the building in December 2020. Defendant Flores obtained a loan from the Tribe in order to purchase the building.

24. GP Odeum was established under California law in 2020 with Defendant Flores as the manager and agent. On information and belief, GP Odeum was formed for the purpose of owning the Winters real property and managing the event business there. The Tribe has no affiliation with GP Odeum.

25. According to a news story linked on the media page of the business, Defendant Flores included the name "Prince" in the name of the business because Defendant Flores "is a die-hard fan of the performer Prince," and added the name "Odeum" as another word for theater or assembly.

**i. Tribal Funds Are Misappropriated to Pay GP Odeum's Legal Fees**

26. Beginning in 2021, on information and belief, Defendant Flores ran into trouble with the permitting required by the City of Winters for her desired use for the Grand Prince Odeum building.

27. In or about January 2022, Defendant Flores hired a Sacramento law firm ("Law Firm") to assist her and GP Odeum in dealing with the permitting issues. Legal services were provided by the Law Firm to Defendant Flores and GP Odeum until approximately July 2023.

28. In order to create the false impression that the legal services were being performed for the benefit of the Tribe, rather than Defendant Flores and GP Odeum, the Law Firm's invoices for legal services were sent via U.S. Mail to the Tribal Accounting Office. Neither Defendant Flores nor GP Odeum ever paid any of those legal invoices.

29. For example, invoices in the amounts of $22,065, $34,990, and $9,037.50 were received by the Tribe on or about March 30, 2022, September 30, 2022, and June 1, 2023, respectively.

30. These and other law Firm invoices were mailed to the Tribe in furtherance of the scheme orchestrated by Defendant Flores to obtain Tribal monies by means of false pretenses, representations, and promises. The Tribe ultimately paid over $250,000.00 in total to the Law Firm for the benefit of defendant Flores and GP Odeum.

31. Creating the false impression that the Law Firm was a "vendor" of the Tribe, Defendant Flores used her purported authority as Tribal Chairwoman to direct Tribal staff to use the Tribe's funds to pay the Law Firm for the hundreds of thousands of dollars of legal services benefitting Flores and GP Odeum.

32. The use of Tribal funds to pay for legal services benefitting Defendant Flores's personal business was never approved by the Tribal Council.

**ii. Other Tribal Funds and Assets Are Diverted for Defendant Flores's Benefit**

33. Defendant Flores has acquired various music memorabilia related to Prince, including clothes, lyric sheets, signed posters, records, and a guitar. The memorabilia is valued at $3,000,000. On information and belief, Defendant Flores purchased the memorabilia using her personal funds. Defendant Flores displays the Prince memorabilia at an annual event known as "Princeology."

34. The memorabilia is not associated with the Tribe in any way.

35. Nonetheless, Defendant Flores used the Tribe's funds to pay for a special fine art insurance policy under the Tribe's insurance to insure her personal Prince memorabilia against loss.

36. Using her position and purported authority as Tribal Chairwoman, Defendant Flores had Tribal staff insure the memorabilia and pay the premiums. In doing so, Defendant Flores falsely represented that the premiums being paid were for the benefit of the Tribe and were part of the Tribe's overall insurance needs.

37. For example, in 2020, 2021, and 2022 the Tribe paid $24,279, $28,542 and $30,255 respectively for Fine Arts insurance premiums to cover Defendant Flores's memorabilia. These payments were paid by check using the mails and drawn on the Tribe's bank account.

38. These and other premium payments were caused by Defendant Flores in furtherance of the scheme she orchestrated to obtain Tribal monies by means of false pretenses, representations, and promises. The Tribe paid a total of $139,592.00 in insurance premiums from 2016 through 2023 for this policy. The use of Tribal funds to insure Defendant Flores's personal memorabilia was never approved by the Tribe's Tribal Council.

### C. Little Big Time Child Development Center and the Individual Defendants Take Over the Tribe's Real Property

39. Defendants Flores, Gonsalves, and Pina make up the current Board of Directors for LBT. Defendant Flores was an initial incorporator of the California Public Benefit Corporation in 2008. LBT has operated as an Internal Revenue Service 501(c)(3) non-profit preschool in Sacramento.

40. LBT operates in a house known to the Tribe as the "Victorian House." The Victorian House is located at 1412 20th Street, Sacramento, CA 95814. The Tribe is the sole member and manager of Sacramento 20th Street Properties LLC, a California LLC which owns the Victorian House. The Victorian House is real property belonging to the Tribe.

41. The Tribe has allowed LBT to operate in the Victorian House. The Tribe has also paid for LBT's insurance, operating costs, and teacher and staff salaries using Tribal funds. At all relevant times, the Tribe was primarily financially responsible for the operations of the preschool.

42. Defendant Flores has treated the Victorian House as her personal residence and event space for many years. For example, she has used the Victorian House to store her Prince memorabilia. Though she previously represented that she intended to move the memorabilia to GP Odeum, she has never done so. Defendant Flores also used the Victorian House to host her annual Prince-themed event, "Princeology," in 2017, 2019, 2023 and 2024.

43. In April 2024, the Tribe's elected Tribal Council decided to cease funding the LBT, effective June 5, 2024.[1] The Tribal Council further decided it was

---

[1] After taking a leave of absence from the Tribal Council for health reasons, on March 19, 2024, Defendant Flores provided notice of her decision to resign as Chairwoman of the Tribal Council, effective immediately. On March 28, 2024, pursuant to Article V, Section 1 of the Constitution, the Tribal Council unanimously took action to declare the position vacant and appoint a new Chairwoman in Resolution 2024-005. On April 27, 2024, Defendant Flores attempted to

in the best interests of the Tribe to sell the Victorian House. The Tribe provided notice of the closure to LBT, and all employees were issued final paychecks and paid out any benefits to which they were entitled before the closing date.

44. On May 3, 2024, the Tribe sent Defendant Flores a letter providing her with notice that she needed to remove any personal belongings located at the Victorian House by May 15, 2024 in preparation for the closure of LBT and sale of the building.

45. On May 3, 2024, Defendant Flores provided the e-mail addresses for various representatives of Caesars Entertainment to the parent of a child at the preschool and caused the parent to contact these representatives. Caesars Entertainment is a critical consultant and business partner of the Tribe's casino. The e-mail that was sent complained about the Tribe's decision to close LBT and stated: "As a partner in the tribe-owned casino, it is my hope that Caesars Entertainment would be vested in the well-being and reputation of the tribe . . . the recent decisions by the Buena Vista Rancheria Tribal Council have raised serious questions about the tribe's commitment to acting in good faith and in the best interests of the community." The e-mail continued: "I believe that your intervention and influence as Caesars Entertainment could play a crucial role in advocating for a reconsideration of the closure decision and promoting transparency and accountability within the tribe's leadership."

46. That same day, Defendant Pina contacted the Tribe's Chief of Staff and alluded to the e-mail to Caesars and referenced conversations he had with Defendant Flores concerning the same. Defendants' efforts, disguised as concern

---

unilaterally rescind her resignation as Chairwoman of the Tribal Council. The Tribal Council rejected that effort to rescind her resignation as invalid as a matter of Tribal law.

for the Tribe's "well-being," were designed to force the Tribe to relinquish its property rights to Defendants.

47. On or about May 15, 2024, Defendant Flores began "squatting" at the Victorian House, falsely claiming it had been her residence for years and refusing to vacate the building. A text message chain described her intent, by remaining at the Victorian House, to disrupt the Tribe's ability to end funding for LBT and interfere with the sale of the Victoria House.

48. Also on or about May 15, 2024, Defendant Flores contacted Tribal Council members, indicating her belief there was a huge conspiracy going on at the Tribe to harm the Tribe. Defendant Flores also posted messages to social media defaming Tribal employees.

49. For example, on May 19, 2024, Defendant Flores published a Facebook message which read, in part: "Since my resignation, I have learned many things about our current Chief of Staff Wayne Smith that chilled me to my soul . . . [H]e should not be overseeing any federal funds, but he currently oversees our funds and directs staff that oversees these funds."

50. On May 20, 2024, the Tribe served Defendant Flores with a 3-day notice to vacate her unlawful squatting in the Victorian House. At all times relevant, LBT has not held a lease for the Victorian House from the Tribe.

51. By letter dated May 22, 2024, Defendant Flores, through her attorney, indicated that neither she nor LBT would be vacating the Victorian House.

52. Defendant Flores has refused to leave the Victorian House and remains squatting in the house. Defendant Flores falsely claims, through letters from her attorney, that both she and LBT are lawful residents of the Victorian House and cannot be removed by the Tribe.

53. On June 5, 2024, the Tribe ceased operating the school and revoked any previous authorization of funding for LBT.

54. Since the Tribe ceased funding LBT's operations, Defendants have directly or indirectly caused the submission of unauthorized and unapproved charges related to teacher and staff salaries for LBT.

55. For example, on or about June 12, 2024 Defendants knowingly caused an LBT employee to submit to the Tribe an administrative timesheet seeking payment for wages for 24 hours worked on June 10, 11, and 12, 2024. As the Tribe had previously provided notice that it would not pay teacher and staff salaries after June 5, 2024, the Tribe did not pay the invoice.

56. Also on June 12, 2024, Defendants knowingly caused LBT to electronically submit a charge to the Tribe's American Express credit card for five days of additional staff salaries from June 10-15, 2024, in the amount of $898.52. This charge was for hours worked by staff a week after the Tribe ceased funding LBT. The charge was made to pay a staffing and temp agency previously used by LBT to employ workers, but the charge was never authorized by the Tribe. The Tribe contacted American Express and has disputed the charge as fraudulent.

57. On June 20, 2024, Defendants knowingly caused LBT to submit by e-mail invoice 723748 seeking $1345.36 from the Tribe for wages, including 20 hours of work that took place after the Tribe ceased funding the entity on June 5, 2024. The payment was not authorized by the Tribe and the Tribe has refused payment.

58. The next day, on June 21, 2024, Defendants knowingly caused a charge to be made to the Tribe's credit card seeking the same $1345.36 from the Tribe for wages—including 20 hours of work after the Tribe ceased funding the entity on June 5, 2024. The payment was not authorized by the Tribe. The Tribe has disputed the charge as fraudulent.

59. As of today, LBT and Defendants Flores, Gonsalves, and Pina continue to unlawfully operate LBT in the Victorian House with the Defendants serving as Board members, and the Victorian House has not been vacated, unlawfully

thwarting the Tribe's efforts to use and enjoy its real property and place the real property on the market for sale.

60. On June 12, 2024, Defendant Gonsalves e-mailed the new Tribal Chairwoman, Jessalynn Pastran. Defendant Gonsalves made allegations of "[w]orries of a serious nature" involving Tribal funds and urged the Chairwoman to "halt" closure of the LBT. Defendant Gonsalves further indicated she was communicating with Defendants Flores and Pina about her allegations. Defendant Gonsalves closed the e-mail by saying she was "worried for the Chairwoman and her family."

61. Defendant Flores has continued to make false and unfounded accusations about Tribal employees and the Tribe, which have been repeated to Tribal Council members.

62. Additionally, Defendant Flores has acted in a threatening manner toward Tribal employees. On one occasion, she accosted a Tribal employee who parked her vehicle near the Victorian House while visiting the Tribe's former office. Defendant Flores began shaking her fist at the employee and told the employee "God is watching you and will punish you for working with the devil."

63. Similarly, after the Tribe hired an outside contractor to obtain a bid for painting the Victorian House following the closure of LBT, Defendant Flores sent the contractor a text message demanding: "Do NOT paint over my Prince Mural. People will be angry!"

64. As a result of these and other false and threatening comments and actions, and statements that she was "watching" the Tribe, the Tribal Council has been forced to relocate its office to an undisclosed location at great expense and inconvenience to the Tribe. Further, any employees who visit the old office must now be accompanied by armed, uniformed security personnel in the interest of safety.

65. The purpose of Defendants' unlawful actions is obvious: to obstruct the Tribe's ability to control the disposition of its funds and real property and return to the situation where Tribal funds could be used by Defendant Flores for her personal benefit.

66. Defendants' scheme to misappropriate the Tribe's property for Defendants' benefit remains ongoing. The Tribe has retained a third-party independent investigator who is presently engaged in a forensic audit to determine whether there has been any additional misuse of Tribal funds and other assets.

**COUNT I – FEDERAL RICO**

67. The Tribe incorporates herein and restates the foregoing paragraphs.

68. The Tribe is a "person" for purposes of 18 U.S.C. §§ 1961(3) and 1964(c).

69. At all relevant times, Defendants are each "person[s]" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

70. Defendants formed an association-in-fact for the purpose of depriving the Tribe of its property. This association-in-fact, the activities of which affected interstate commerce, is an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

71. Defendants conducted and participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).

72. Defendants engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in the acts set forth above. The acts set forth above constitute violations of 18 U.S.C. §§ 1341, 1343, and 1951:

A. Having devised a scheme or artifice to defraud, or for obtaining money or property by means of materially false or fraudulent pretenses, representations, or promises, one or more Defendants used the mails or commercial interstate carrier for the purpose of executing such scheme;

B. Having devised a scheme or artifice to defraud, or for obtaining money or property by means of materially false or fraudulent pretenses, representations, or promises, one or more Defendants transmitted or caused to be transmitted by means or wire communication in interstate commerce any writings or sounds for the purpose of executing such scheme; or

C. In any way obstructing, delaying, or affecting commerce or the movement of any article or commodity in commerce by extortion by one or more Defendants, or attempting or conspiring to do so.

73. The acts of racketeering activity referred to in the previous paragraph constituted a pattern of racketeering with the meaning of 18 U.S.C. § 1961(5).

74. As a result of Defendants' scheme, Plaintiff lost the hundreds of thousands of dollars it paid for the benefit of Defendants Flores and GP Odeum, and is currently being deprived of its ability to possess and sell its valuable real property by Defendants Flores, Gonsalves, and Pina. The Tribe has been injured in its business and property within the meaning of 18 U.S.C. § 1964(c) by reason of Defendants' violation of 18 U.S.C. § 1962(c).

75. As a result of their misconduct, Defendants are liable to Plaintiff for its losses in an amount to be determined at trial.

76. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages sustained, plus attorneys' fees, from Defendants.

**COUNT II – FEDERAL RICO CONSPIRACY**

77. The Tribe incorporates herein and restates the foregoing paragraphs.

78. Defendants Flores, Gonsalves, and Pina are associated with the enterprise, and they have agreed and conspired to violate 18 U.S.C. 1962(c) as each has agreed to participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity.

79. Defendants' conspiracy to violate 18 U.S.C. § 1962(c) is a violation of 18 U.S.C. § 1962(d).

80. As a result of their misconduct, Defendants are liable to Plaintiff for its losses in an amount to be determined at trial.

81. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages sustained, plus attorneys' fees, from Defendants.

## COUNT III – CIVIL CONSPIRACY

82. The Tribe incorporates herein and restates the foregoing paragraphs.

83. California law makes it unlawful for a combination of two or more persons to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means when there is resultant damage caused by the defendants' acts committed in furtherance of the conspiracy.

84. At all relevant times, Defendants Flores, Gonsalves, and Pina agreed to and did conspire to willfully and maliciously injure the Tribe in its reputation, trade, business or profession through fraudulent conduct.

85. Defendants Flores, Gonsalves, and Pina, through the enterprise they joined, have knowingly, willfully, and intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise as described above.

86. Defendants Flores, Gonsalves, and Pina, and each of them, also conspired to commit the frauds alleged herein, in that Defendants Flores, Gonsalves, and Pina conspired to accomplish the scheme and had a meeting of the minds to accomplish that goal through one or more unlawful acts of fraud, as alleged herein.

87. The Tribe has suffered harm as a direct and proximate result of Defendants' conduct and conspiracy in an amount to be proven at trial.

**COUNT IV – CONVERSION**

88. The Tribe incorporates herein and restates the foregoing paragraphs.

89. Defendant Flores wrongfully exercised control over the Tribe's government finances for her personal benefit over a period of years.

90. The Tribe, acting through the Tribal Council, has sole ownership of its bank accounts and credit cards, and other Tribal government funds.

91. Defendant Flores substantially interfered with the Tribe's property by knowingly or intentionally misusing Tribal government funds for her personal benefit without the express consent of the Tribal Council.

92. The Tribe has suffered harm in an amount to be proven at trial.

**COUNT V – UNJUST ENRICHMENT**

93. The Tribe incorporates herein and restates the foregoing paragraphs.

94. Defendants Flores, GP Odeum, and LBT obtained benefits as a result of the scheme to defraud the Tribe of its business or property, and misuse Tribal funds for Defendants' personal benefit.

95. All such benefits that Defendants Flores, GP Odeum, and LBT obtained came at the expense of the Tribe.

96. The circumstances make it unjust for Defendants Flores, GP Odeum, and LBT to retain the benefits without repayment to the Tribe.

97. The Tribe is entitled to recover the amounts by which Defendants Flores, GP Odeum, and LBT were unjustly enriched, in an amount to be proven at trial.

**JURY DEMAND**

98. Pursuant to Fed. R. Civ. P. 38(b), the Tribe hereby demands a trial by jury of all issues so triable that are raised herein or which hereinafter may be raised in this action.

**REQUEST FOR RELIEF**

WHEREFORE the Tribe is entitled to and respectfully requests the following relief:

1. Finding that all Defendants are jointly and severally liable for all damage caused to the Tribe;
2. Awarding the Tribe monetary damages in an amount to be proven at trial;
3. Awarding the Tribe (treble) monetary damages pursuant to 18 U.S.C. § 1964(c);
4. Awarding the Tribe its litigation expenses, including reasonable attorneys' fees, costs, and disbursements;
5. Awarding ressstitution and/or disgorgement of profits to the Tribe in an amount to be proven at trial; and
6. Granting such other relief as the case may require or as may be deemed proper and equitable.

DATED: July 2, 2024

Respectfully submitted,

KILPATRICK TOWNSEND & STOCKTON LLP

By: *\/s/ Kendra C. Chapman*
KENDRA C. CHAPMAN

Attorneys for Plaintiff
BUENA VISTA RANCHERIA OF ME-WUK INDIANS